UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIK ALKE,

                          Plaintiff,

           -v-                            9:16-CV-845

NEW YORK STATE DEPARTMENT
OF CORRECTIONS AND COMMUNITY
SUPERVISION, STEVEN RACETTE,
Superintendent; Clinton Correctional
Facility, DR. RICHARD ADAMS, Clinton
Correctional Facility, BRIAN FISCHER,
DOCCS Commissioner, FNU TAYLOR,
Nurse; Clinton Correctional Facility, and
VONDA JOHNSON, Facility Health
Services Director; Clinton Correctional
Facility,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

LAW OFFICE OF BERNARD V.         BERNARD V. KLEINMAN, ESQ.
    KLEINMAN, PLLC
Attorneys for Plaintiff
2 Westchester Park Drive, Suite 418
White Plains, NY 10604

HON. ERIC T. SCHNEIDERMAN       CHRISTOPHER J. HUMMEL, ESQ.
Attorney General for the State of New York   Ass't Attorney General
Attorneys for Defendants
The Capitol
Albany, NY 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

Plaintiff Erik Alke ("Alke" or "plaintiff") has filed this civil rights action against defendants New York State Department of Corrections and Community Supervision ("DOCCS"), DOCCS Commissioner Brian Fischer ("Commissioner Fischer"), Clinton Correctional Facility ("Clinton CF") Superintendent Steven Racette ("Superintendent Racette"), Vonda Johnson, Clinton CF's Health Services Director ("Director Johnson"), Dr. Richard Adams ("Dr. Adams"), and Nurse Jeffery Taylor ("Nurse Taylor") (collectively "defendants").[1]

According to Alke, defendants violated his Eighth Amendment rights under 42 U.S.C. § 1983 as well as his rights under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, the New York State Constitution, and state common law when they failed to properly treat a serious injury he sustained to his lower back during his time as an inmate at Clinton CF, resulting in extreme, disabling pain.

On October 27, 2016, defendants moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) seeking partial dismissal of Alke's claims. The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. BACKGROUND[2]

On October 31, 2005, after he completed a "grueling physical examination," the U.S. Department of Homeland Security ("DHS") hired Alke as a Customs and Border Protection

---

[1] Alke also named as defendants "John Does 1 through 20," but these parties were dismissed on March 13, 2017 by agreement of counsel.

[2] The following factual allegations are drawn from plaintiff complaint and attached exhibits and are assumed true for purposes of resolving defendants' partial motion to dismiss.

Agent.  Compl. ¶¶ 27, 29.  Plaintiff remained a DHS agent until November 9, 2009, when he was convicted of second degree manslaughter and sentenced in Supreme Court, Queens County, to a term of incarceration "of from three to nine years."  Id. ¶ 26.  Plaintiff was committed to the custody of DOCCS, which initially placed him at Cayuga Correctional Facility in Moravia, New York.  Id. ¶¶ 26, 30.  However, on early 2010, DOCCS transferred plaintiff to Clinton CF in Dannemora, New York, where the events giving rise to this lawsuit occurred.  Id. ¶ 30.

On August 4, 2013, at around 4:30 p.m., Alke, along with several other inmates, were tasked with moving "some office furniture" from the Watch Commander's Office to another location in the facility.  Compl. ¶ 32.  Among other things, the furniture included a solid oak desk that, at over ten feet long, "weighed in excess of 400 pounds."  Id.

Although Alke and the other inmates managed to lift this desk over a "saddle" between the Watch Commander's Officer and the hallway, it eventually became lodged in a stairwell.  Compl. ¶ 32.  Plaintiff, "seeking to resolve the issue, got down to look at the situation.  While the desk was being held by the other inmates, a piece slid down, striking [plaintiff]," who fell to the concrete floor.  Id. ¶¶ 32-33.  Plaintiff "heard a crack in his lower back, around the coccyx bone."  Id. ¶ 33.  Plaintiff remained pinned under the desk for "approximately five minutes," but eventually freed himself without the assistance of any other inmates or corrections officers, who merely stood by and watched.  Id. ¶¶ 33-35.

At this point, an unidentified corrections officer told Alke he could go to the facility hospital.  Compl. ¶ 35.  Plaintiff alleges that it took him "more than 20 minutes" to get to the hospital, even though "under normal circumstances" the trip should only take three to five minutes.  Id.  When plaintiff arrived at the hospital, Nurse Taylor conducted a "less than two

minute examination" before concluding that plaintiff "had likely badly bruised his back and kidneys."  Id. ¶ 36.  According to plaintiff, "[n]o other medical action was taken to either diagnose or treat" him at that time.  Id.  However, Nurse Taylor informed plaintiff he "would be called for sick call within three days."  Id. ¶ 37.

On August 8, 2013, four days after the incident, Alke was "still in intense pain" and "highly immobile."  Compl. ¶ 38.  Because he had not yet heard from Nurse Taylor or anyone else at the facility hospital, plaintiff took it upon himself to "put in for sick call."  Id.  The following day, August 9, Nurse Clemens examined plaintiff.  Id. ¶ 39.  Plaintiff explained to Nurse Clemens that he had injured his lower back and showed her "a bulge where his spine was protruding out from his back."  Id.

After Nurse Clemens completed her examination, Dr. Adams entered the room.  Compl. ¶¶ 39-40.  According to plaintiff, Dr. Adams is "not a Medical Doctor," but rather holds a degree in osteopathic medicine.  Id. ¶ 39 & n.1.  Plaintiff alleges that Dr. Adams, "in a hurried, and clearly annoyed tone and manner, did a less than cursory examination" of his injury.  Id. ¶ 40.

Alke alleges that Dr. Adams told him that "all he had was a strained muscle, and that he was faking his pain, and that [he] was attempting to shirk his duties and work."  Compl. ¶ 40.  Dr. Adams told plaintiff that "going back to work would be good for him" and instructed plaintiff to "get out of [his] office."  Id.  When plaintiff objected to Dr. Adams's improper medical conclusions and warned Dr. Adams he would "get an attorney to protect him," Dr. Adams stated:  "Go ahead, I don't care."  Id. ¶ 41.

On August 16, 2013, Alke received x-rays of his lower back.  Compl. ¶ 42.  After these x-rays were taken, plaintiff told the radiologists that "he was still suffering from intense

pain." Id. When one of the physician's assistants was shown the x-rays of plaintiff's back, she expressed surprise that plaintiff was even able to walk. Id. According to plaintiff, the extent of the damage revealed by the x-rays precipitated a discussion amongst the medical personnel about whether plaintiff's lower back injury was a pre-existing condition. Id.

Alke denies ever having complained about any prior back injury, points out that none of his medical records ever reflected any pre-existing injury, and emphasizes that he would have been unable to perform his past work as a border patrol agent if he had been suffering from one or more pre-existing back problems. Compl. ¶¶ 28-29, 42.

Ultimately, these medical personnel informed Alke that he was suffering from "compression fractures" in his lower back, and that "a severe spinal injury was also quite possible." Compl. ¶ 43. Plaintiff was sent to Alice Hyde Medical Center ("Alice Hyde") in nearby Malone, New York, for "more extensive x-rays." Id. Unnamed DOCCS officers kept plaintiff in a shackled position during his transfer from Clinton CF to Alice Hyde despite his "repeated complaints" that he was in serious pain. Id. ¶ 44.

On August 21, 2013, Dr. Adams met with Alke and again informed plaintiff that "there was nothing wrong with him." Compl. ¶ 45. According to plaintiff, Dr. Adams "admitted that he had not bothered to review the x-rays, and was relying entirely upon the reports from the radiologist that he allegedly received." Id. Dr. Adams refused to provide "any treatment or care" to plaintiff. Id. Dr. Adams again told plaintiff "he should return to work and that the physical labor would be good for his condition." Id.

On September 4, 2013, Dr. Adams again met with Alke. Compl. ¶ 47. This time, Dr. Adams informed plaintiff he had received the "hospital review" from Alice Hyde, which showed plaintiff had sustained only a "compression fracture" to his "T12 vertebrae." Id.

According to plaintiff, Dr. Adams insisted that "this was the only injury that had been suffered as a result of the accident, and that any other injuries or pain were due to a pre-existing condition or some undiagnosed degenerative disease." Id. As with before, however, plaintiff maintains that he had never suffered from any other back injury or disease. Id. ¶¶ 48-49.

On October 4, 2013, Dr. Adams again met with Alke, who by then was "unable to sit, stand, or walk for any extended period of time." Compl. ¶ 50. At plaintiff's urging, Dr. Adams sent plaintiff for an MRI image of his lower back. Id. According to plaintiff, Dr. Adams offered plaintiff "a narcotic medication to alleviate the pain." Id. ¶ 51. Plaintiff refused this offer because the medication in question, Percocet 5/325, "is a strong pain killer with some very dangerous side effects." Id. ¶ 70 & n.5.

On November 4, 2013, unnamed corrections officers transported Alke to Albany Medical Center in Albany, New York for an MRI image of his lower back. Compl. ¶ 54. As before, plaintiff alleges that he was shackled in an extremely painful position for the duration of this "twenty hour round-trip." Id. ¶¶ 54-55. According to plaintiff, the MRI image taken at this time "was not done for his lower back, but, rather, for his mid- or thoracic back area." Id. ¶ 56. Plaintiff endured a second round trip between Clinton CF and Albany Medical Center on December 3, 2013 for additional MRI exams. Id. ¶ 57.

Alke alleges that these two MRI exams, which were consistent with one another, revealed that plaintiff suffered from: (1) a compression fracture at the T12 vertebral body; (2) disc bulging at the L3-L4 lumbar vertebrae; (3) broad disc bulging in the right paramedian area, revealing a "distinct annular fissure," and (4) slight loss of disc signal in the T2 thoracic vertebrae. Compl. ¶ 58.

On December 20, 2013, Dr. Adams again met with Alke. Compl. ¶ 60. Plaintiff

alleges that Dr. Adams again insisted that the only damage plaintiff suffered from his "furniture mishap" was damage to the T12 vertebrae, "and that any other injuries (notwithstanding the complete absence of any supporting factual or medical proof) was pre-existing." Id. The only treatment Dr. Adams prescribed for plaintiff was physical therapy. Id.

On January 3, 2014, Alke went to physical therapy. Compl. ¶ 61. According to plaintiff, the physical therapist told him that "the only damage that he would treat [him] for was an injury to his T12 vertebrae, and that any other injuries were pre-existing." Id. Plaintiff alleges that the first page of the earlier medical report from Alice Hyde, which showed the significant injuries to plaintiff's lower back, had been removed from the file held by DOCCS. Id. ¶ 62.

On January 29, 2014, Dr. Adams again met with Alke. Compl. ¶ 63. According to plaintiff, Dr. Adams told him that "I can't do anything to fix you, you're going home soon anyway." Id.

On February 11, 2014, an unidentified radiologist showed up at Alke's physical therapy session to inquire as to how he was doing. Compl. ¶ 64. When plaintiff told the radiologist that he was only being treated for his T12 injury, the radiologist asked the physical therapist if he had looked at plaintiff's x-rays. Id. Plaintiff alleges that when the physical therapist conceded that he had never done so, the radiologist retrieved them and informed the physical therapist that plaintiff was in fact suffering from "multiple fractures of the spinal area." Id.

On February 12, 2014, Alke alleges that he learned of a medical report from Clinton CF that falsely states he refused an offer of narcotic pain medication because of "past

addictions." Compl. ¶ 52. Plaintiff alleges that this statement "is a complete falsehood and alteration of the actual records." Id. In support of this assertion, plaintiff alleges that, as a law enforcement officer, "he was periodically tested and never found to have any illicit substance in his system." Id. Plaintiff further alleges that, after he learned of this false medical record, he sent a letter to Director Johnson "vehemently object[ing] to [any] characterization" of plaintiff having had "any addiction issues whatsoever." Id. ¶ 53. According to plaintiff, neither DOCCS nor Director Johnson ever responded to this complaint. Id.

In August 2014, Alke underwent a "nerve damage test," which confirmed that plaintiff had suffered nerve damage at the base of his spine. Compl. ¶ 65.

On November 13, 2014, Alke wrote a letter to Director Johnson requesting to be treated by someone other than Dr. Adams. Compl. ¶ 69. Plaintiff's letter explained that his repeated requests for further tests and x-rays had been ignored. Id. According to plaintiff, Director Johnson ignored this letter. Id.

In January 2015, after Alke filed a grievance, Superintendent Racette directed Dr. Adams to "fully examine[ ]" and "competently diagnose[ ]" *all* of plaintiff's injuries. Compl. ¶ 66. Plaintiff alleges that Dr. Adams took no action in response to this command. Id. ¶ 67.

On October 17, 2015 Alke was released from DOCCS's physical custody and placed on state parole. Compl. ¶ 71. Since his release, plaintiff has been treated by a number of physicians and therapists due to the injuries he suffered at Clinton CF. Id. ¶¶ 72-73. As plaintiff's primary care physician has observed, he "has tremendous back pain and feels as there is a fracture of [his] back . . . patient is unable to sit or stand without excruciating

pain. [P]atient is unable to function in this manner." Id. ¶ 74.

## III. **LEGAL STANDARD**

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Although a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief' (FED. R. CIV. P. 8(A)(2)), more than mere conclusions are required." Id. "Indeed, '[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims." Id.; see also Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face").

"When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.). In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV. **DISCUSSION**

Alke asserts (1) § 1983 medical indifference claims against DOCCS, Commissioner

Fischer, Superintendent Racette, Director Johnson, Dr. Adams, and Nurse Taylor (First and Second Causes of Action), (2) ADA and Rehabilitation Act claims against DOCCS, Director Johnson, Dr. Adams, and Nurse Taylor (Third and Fourth Causes of Action), and (3) common law claims for negligence, neglect, and a violation of the New York State Constitution against DOCCS, Commissioner Fischer, Superintendent Racette, Director Johnson, Dr. Adams, and Nurse Taylor (Fifth, Sixth, and Seventh Causes of Action).[3]

### A.  42 U.S.C. § 1983

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992).  However, "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).  Thus, a § 1983 claim requires a plaintiff to show (1) the deprivation of a right, privilege, or immunity secured by the Constitution and its laws by (2) a person acting under the color of state law.  42 U.S.C. § 1983.

---

[3]  Alke also purports to identify an Eighth Cause of Action for punitive damages.  However, "[a] party may not maintain a separate claim for punitive damages; where punitive damages may properly be awarded, they may properly be demanded as a form of relief, and a separate claim for punitive damages should be deemed a request for this relief." Eugine Iovine Inc. v. Rudox Engine & Equip. Co., 871 F. Supp. 141, 147 (E.D.N.Y. 1994).

## 1. **Eleventh Amendment Immunity**[4]

As an initial matter, defendants contend that Alke's § 1983 claims are barred by the Eleventh Amendment's guarantee of state sovereign immunity insofar as these claims are asserted against (1) DOCCS itself; and (2) the various individual defendants in their *official* capacities.  Plaintiff, for his part, appears to concede this reality but also insist that the individually named defendants are not being sued under § 1983 in their official capacities.  Pl.'s Opp'n at 15.[5]

"As a general rule, state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress."  Jackson v. Battaglia, 63 F. Supp. 3d 214, 219-20 (N.D.N.Y. 2014) (citation omitted).

This immunity "extends beyond state agencies to state officials at those agencies working on behalf of the state (i.e. in their official capacities)."  Emmons v. City Univ. of N.Y., 715 F. Supp. 2d 394, 406 (E.D.N.Y. 2010); see also Marino v. City Univ. of N.Y., 18 F. Supp. 3d 320, 334 (E.D.N.Y. 2014) ("A suit against a state official in his or her official capacity for monetary damages is treated as a suit against the state.").

The State of New York has not waived its sovereign immunity from § 1983 claims in federal court.  See Jackson, 63 F. Supp. 3d at 220.  Nor has Congress validly abrogated

---

[4] Technically, "[a] claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction."  Morales v. New York, 22 F. Supp. 3d 256, 268 (S.D.N.Y. 2014) (citation omitted).  In other words, this kind of argument is properly made under Rule 12(b)(1), a different provision of the Federal Rules of Civil Procedure than the one under which defendants' motion appears to have been made.  Nevertheless, because "subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court sua sponte," Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 700 (2d Cir. 2000), the best course of action is to resolve this issue now.

[5] Pagination corresponds with that assigned by CM/ECF.

New York's sovereign immunity from these claims.  Id.  Further, and as relevant here,

"DOCCS and its facilities are state agencies for purposes of the Eleventh

Amendment."  Rother v. NYS Dep't of Corr. & Cmty. Supervision, 970 F. Supp. 2d 78, 89-90

(N.D.N.Y. 2013) (Kahn, J.).  Accordingly, to the extent that plaintiffs' § 1983 claims may be

construed as being asserted against DOCCS, or one or more of the individual defendants in

their *official* capacities, any such claims must be dismissed.[6]

## 2. **Supervisory Liability**

Defendants next contend that Alke's § 1983 individual-capacity claims against

Commissioner Fischer, Superintendent Racette, and Director Johnson must be dismissed

because these defendants are merely supervisory officials who lacked the kind of "personal

involvement" in the alleged mistreatment of plaintiff's injuries during his time at Clinton CF

that might give rise to liability under § 1983.  Plaintiff concedes that these defendants held

"supervisory positions" with DOCCS and Clinton CF but maintains that he has sufficiently

alleged their personal involvement in the matters at issue.

"It is well-settled in this Circuit that personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983."  Odom v.

Matteo, 772 F. Supp. 2d 377, 403 (D. Conn. 2011) (quoting Colon v. Coughlin, 58 F.3d 865,

---

[6]  It is recognized that the doctrine of Ex parte Young permits a suit to proceed against an otherwise immune entity if a plaintiff names a state official in his or her official capacity provided the plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective."  Brown v. New York, 975 F. Supp. 2d 209, 222 (N.D.N.Y.2013) (D'Agostino, J.) (citations omitted).  To the extent that the "wherefore" clause of his complaint includes a passing reference to "injunctive relief" in the form of a declaration that certain DOCCS policies or practices were unconstitutional as applied to him, plaintiff fails to allege an *ongoing* deprivation of a federal right and therefore the doctrine of Ex parte Young is inapplicable here.  See, e.g., Roque v. Armstrong, 392 F. Supp. 2d 382, 387 (D. Conn. 2005) ("The Second Circuit has held that an inmate's request for injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution.").

873 (2d Cir. 1995)).  "The personal involvement of a supervisory defendant may be shown by evidence that:  (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring."  Odom, 772 F. Supp. 2d at 403 (quoting Colon, 58 F.3d at 873); see also Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014) (noting that the continued vitality of all five Colon factors remains an open question post-Iqbal).

Alke contends that Commissioner Fischer, Superintendent Racette, and Director Johnson were all "personally involved" in the alleged deprivation of proper medical care because, inter alia, they implemented a deficient system of health care at Clinton CF and failed to adequately train and supervise Dr. Adams and Nurse Taylor.  Compl. ¶¶ 91-94.

As to Commissioner Fischer in particular, Alke emphasizes that he is "directly" responsible for appointing Dr. Karl Koenigsmann, the Deputy Commissioner and Chief Medical Officer of DOCCS, who signed off on plaintiff's medical records.  Pl.'s Opp'n at 21.

As to Superintendent Racette, Alke points out that this defendant responded to the grievance plaintiff submitted on December 5, 2014, which alleged that neither Director Johnson nor Dr. Adams had properly addressed his injuries, by ordering an investigation.  Pl.'s Opp'n at 22 (referencing an Exhibit H).

Finally, as to Director Johnson, Alke contends that although she supervised Dr.

Adams, she failed to respond to plaintiff's February 14, 2014 letter in which he "raised serious concerns regarding his treatment." Pl.'s Opp'n at 23. Plaintiff supports this assertion by pointing to internal Clinton CF documents that demonstrate she actually directed Dr. Adams to answer plaintiff's letter and "take appropriate action." Id. at 23-24 (referencing an Exhibit C).

Alke's arguments about these three defendants still fail for several reasons. First, a court considering the sufficiency of a plaintiff's complaint generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

Although his complaint attached a number of exhibits, the documents referenced in Alke's opposition memorandum in support of his assertions about the personal involvement of Commissioner Fischer, Superintendent Racette, and Director Johnson appear to be an entirely different group of exhibits, raising questions about whether they may fairly be considered on a Rule 12(b)(6) motion.

Even putting that issue aside, however, "[t]here is no *respondeat superior* liability in § 1983 cases," Green v. Bauvi, 46 F.3d 189, 194 (2d Cir. 1995), and therefore "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (internal quotation marks omitted).

A review of Alke's complaint reveals that this is precisely the basis on which he seeks to hold Commissioner Fischer and Superintendent Racette liable—that, as "administrative

heads" of DOCCS and Clinton CF, they bore general responsibility for the care and treatment of inmates in their custody.  Compl. ¶ 84.  Yet despite this duty of care, they knowingly implemented an inadequate system of health care, id. ¶ 91, and knew, or should have known, about the alleged misconduct of certain subordinate officials, such as Director Johnson, Dr. Adams, and Nurse Taylor, id. ¶¶ 85-87.

Alke's conclusory assertion that these administrators devised and implemented some kind of policy that required subordinates to provide only inadequate health care to inmates fails to state a plausible claim for relief.  Cf. Schnauder v. Gibens, 679 F. App'x 8, 10 (2d Cir 2017) (summary order) (affirming dismissal of Monell claim based on similar assertions where the inmate-plaintiff's complaint only included a "detailed recounting of his own experiences" rather than any specific, factual allegations concerning the policy in question).

Alke's further contention—that Superintendent Racette and Director Johnson were *personally* involved in plaintiff's improper medical care in a deliberately indifferent manner—is also rejected.  At best, plaintiff has alleged that both of these defendants actually responded to his letters by directing their subordinates to take appropriate action, including an investigation of plaintiff's claims.  See Sharma v. D'Silva, 157 F. Supp. 3d 293, 305-06 (S.D.N.Y. 2016) (dismissing § 1983 supervisory liability claims against prison officials who responded to the plaintiff's letters by delegating subordinates to handle the prisoner's allegations); Lloyd v. City of N.Y., 43 F. Supp. 3d 254, 267 (S.D.N.Y. 2014) ("If the supervisor fails to respond to the letter or passes the letter on to a subordinate to handle, the general rule is that the supervisor is not personally involved.").

Because Alke has failed to plead facts sufficient to *plausibly* suggest any of these three defendants were personally involved in the alleged constitutional deprivations,

the § 1983 claims against them must be dismissed.

## B. Disability Claims

Defendants next contend that Alke has failed to plead viable claims under either the ADA or the Rehabilitation Act.

"When brought together, claims under Title II [of the ADA] and Section 504 [of the Rehabilitation Act] may be treated identically." Hilton v. Wright, 928 F. Supp. 2d 530, 557 (N.D.N.Y. 2013).

To state a claim under these anti-discrimination statutes, a plaintiff must establish:  "(1) he is a qualified individual with a disability; (2) the defendant is subject to [the statutes]; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by defendants because of his disability." Disabled in Action v. Bd. of Elections in City of N.Y., 752 F.3d 189, 196-97 (2d Cir. 2014) (quoting McElwee v. Cty. of Orange, 700 F.3d 635, 640 (2d Cir. 2012)).

"[T]he phrase 'services, programs, or activities' has been interpreted to be a 'catch-all phrase that prohibits all discrimination by a public entity.'" Noel v. N.Y.C. Taxi & Limousine Comm'n, 687 F.3d 63, 68 (2d Cir. 2012) (quoting Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 45 (2d Cir. 1997)).

Importantly, however, neither of these statutes create remedies for "incompetent [medical] treatment" or "medical malpractice." Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (Posner, J.).  Indeed, "[c]ourts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment" in cases where the inmate fails to allege he or she "was treated differently *because of* his or her disability." Elbert v. N.Y. State Dep't of Corr.

Servs., 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) (collecting cases).

Alke's complaint sets forth in detail the ways in which Dr. Adams and Nurse Taylor repeatedly failed to provide him with appropriate medical treatment for his serious back injury. But contrary to plaintiff's assertion, he has failed to plead facts showing that other, uninjured prisoners were somehow treated more favorably. See Elbert, 751 F. Supp. 2d at 595-96 (collecting cases observing that a disabled prisoner's discrimination suit would be viable "if it alleges that he or she has been denied services that have been provided to other prisoners").

Nor has he made a plausible "showing that denial of [appropriate medical] treatment was attributable to bias based on his disability." Schnauder, 679 F. App'x at 11 (dismissing inmate's ADA and Rehabilitation Act claims based on "denial of timely and meaningful medical treatment"); Elbert, 751 F. Supp. 2d at 596 (dismissing disability claims where complaint alleged prisoner "was not properly treated *for* his [serious medical condition], not that he was mistreated *because* of [it]"). In other words, "while [ ]he may have alleged medical malpractice, [ ]he has not alleged discrimination." McGugan v. Aldana-Bernier, 752 F.3d 224, 233 (2d Cir. 2014). Accordingly, plaintiff's disability discrimination claims must be dismissed.

### C. State Law Claims

Finally, defendants contend that Alke's claims alleging negligence and ministerial neglect under common law and the New York State Constitution must be dismissed because of the immunity granted to them by operation of section 24 of New York State's Correction Law.

"Section 24 provides immunity for DOCCS employees from lawsuits based on acts or

omissions within the course of their employment, and requires that such actions be brought in the New York Court of Claims as a claim against the state." Parris, 947 F. Supp. 2d at 365 (citing N .Y. CORRECT. LAW § 24).  Although "Section 24 is not a bar to claims against corrections officers and employees under § 1983, . . . it does provide immunity for claims under state laws."  Id.  "Such immunity is available whether the action is pursued in state court or, under pendent jurisdiction, in federal court."  Id. (quoting Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir. 1997).

Although it is broad, "[i]mmunity under Section 24 is not automatic or absolute for DOCCS's employees."  Reyes v. Wenderlich, 2016 WL 145555, at *2 (W.D.N.Y. Jan. 11, 2016) (citation omitted).  The scope of the immunity "turns on whether the challenged conduct occurred within the scope of the employment and in the discharge of the [employee's] duties."  Id.  Generally speaking, the answer to this question involves a consideration of

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

Ierardi, 119 F.3d at 187 & n.3 (quoting Riviello v. Waldron, 47 N.Y.2d 297, 302 (N.Y. 1979).

"As courts have repeatedly acknowledged, 'an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or with what disregard of instructions.'"  Reyes, 2016 WL 145555 at *2 (quoting Cepeda v. Coughlin, 513 N.Y.S.2d 528, 530 (N.Y. App. Div. 3d Dep't 1987)).  Accordingly, "on-the-job conduct by [DOCCS] employees" has generally only been found actionable in "cases in

which the conduct was prompted purely by personal reasons unrelated to the employer's interest or indicate[d] an intentional course of conduct contrary to institutional rules, training[,] and common sense." Degrafinreid v. Ricks, 452 F. Supp. 2d 328, 334 (S.D.N.Y. 2006) (internal citations and quotation marks omitted).

Alke contends that § 24 does not shield defendants from his state law claims because their actions "were so egregious that they must fall outside of their acceptable conduct." Pl.'s Opp'n at 29. In support of this position, plaintiff cites to cases like DeLee v. White, 2011 WL 7415124 (W.D.N.Y. Nov. 15, 2011), which declined to apply § 24 at the motion-to-dismiss stage to immunize a corrections officer who was alleged to have sexually assaulted, punched, and kicked an inmate in retaliation for filing a commissary grievance. Id. at *18. Based on those allegations, the DeLee Court held that, viewed in the light most favorable to the inmate-plaintiff, "a reasonable jury could find [the officer's] conduct was not within the official scope of his duties." Id.

But disagreement over what Alke and defendants consider "proper," "necessary," and "appropriate" medical treatment is not sufficient to avoid § 24's bar. Compl. ¶ 116. Plaintiff does not deny that he repeatedly met with DOCCS medical staff, including Dr. Adams and Nurse Taylor, or that he received some manner of treatment and investigation. Rather, he disagrees with the manner in which he was treated and contends that these medical defendants could have done so much more.

Even assuming the medical staff improperly performed their duties or performed their duties poorly, they were performing acts within the scope of their employment with DOCCS. Cf. Olutosin v. Lee, 2016 WL 2899275, *12 (S.D.N.Y. May 16, 2016) (dismissing state law claims for assault, battery, and negligence as barred by § 24 against DOCCS

- 19 -

officials because "the officers involved were endeavoring to do their job—perhaps poorly—at the time of the [alleged actions]").  In fact, Alke's allegations are more like those in Reyes, where the court applied § 24 to bar an inmate's "claims of negligence against members of DOCCS's medical staff" because they "relate[d] to allegations that defendants denied certain of [the inmate's] emergency sick-call requests and, when he was seen, *ignored his complaints*."  Reyes, 2016 WL 145555, at *2 (emphasis added).  Accordingly, plaintiff's state law claims must be dismissed.

In addition, the State of New York has not consented to be sued in federal court for, and Congress has not validly abrogated state sovereign immunity from, "claims arising under state common law."  Soloviev v. Goldstein, 104 F. Supp. 3d 232, 244 (E.D.N.Y. 2015) (collecting cases).  Accordingly, plaintiff's state common law claims must also be dismissed insofar as they may be construed as being asserted against DOCCS, a state entity.

## V.  CONCLUSION

Defendants' partial motion to dismiss will be granted.  However, Alke's § 1983 medical indifference claims against Dr. Adams and Nurse Taylor remain for discovery.

Therefore, it is

ORDERED that

1.  Defendants' partial motion to dismiss is GRANTED;

2.  Plaintiff's § 1983 claims against DOCCS are DISMISSED;

3.  Plaintiff's § 1983 official-capacity claims are DISMISSED;

4.  Plaintiff's § 1983 individual-capacity claims against Commissioner Fischer, Superintendent Racette, and Director Johnson are DISMISSED;

5.  Plaintiff's ADA and Rehabilitation Act claims are DISMISSED;

6.  Plaintiff's common law claims are DISMISSED;

7.  Plaintiff's § 1983 medical indifference claims against Dr. Adams and Nurse Taylor

REMAIN for discovery.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  August 9, 2017
        Utica, New York.